**MORAN v. PITTSBURGH–DES MOINES
STEEL CO. et al.**

Civ. No. 4761.

United States District Court
W. D. Pennsylvania.

July 29, 1949.

260

Marvin C. Harrison, Harrison, Thomas, Spangenberg & Hull, Cleveland, Ohio, Premo J. Columbus, Pittsburgh, Pa., for plaintiff.

Harold E. McCamey, Dickie, Robinson & McCamey, Pittsburgh, Carl E. Glock, Reed, Smith, Shaw & McClay, Pittsburgh, for defendants.

GOURLEY, District Judge.

## History of Litigation

This is a retrial of an action for wrongful death. Plaintiff sues as Administratrix of the Estate of her husband, Patrick J. Moran. The defendants are Pittsburgh-Des Moines Steel Company, a partnership, John E. Jackson, individually, a member of the partnership, and Pittsburgh-Des Moines Company, a corporation. The subject matter of the suit is the recovery of damages occasioned to the plaintiff by the death of her husband in a disaster which took place in the city of Cleveland, state of Ohio, on October 20, 1944.

The action is a most involved, complicated and intricate proceeding. The trial commenced on November 8, 1948 and terminated on January 5, 1949. The record is voluminous and comprises seven different volumes.

At the first trial the Court granted the defendants' motion for involuntary nonsuit and dismissed the action against all the defendants. The plaintiff appealed, the Circuit Court reversed and held that suffi-

cient evidence existed in the record to require the consideration of the jury. Moran v. Pittsburgh-Des Moines Steel Co., et al., 3 Cir., 166 F.2d 908.

Substantially the same evidence was presented by the plaintiff that was introduced at the first trial. In addition thereto, direct testimony was offered that the catastrophe or the accident was caused through negligence of the defendants. In other words, in the first trial the basis upon which the plaintiff premised her right to recover related to testimony, direct or circumstantial, from which inferences could be drawn that the defendants were negligent. In the second trial, in addition to the proof just referred to, direct testimony was offered that the accident or catastrophe was caused by the negligence of the defendants.

The jury returned a verdict in favor of all the defendants, and the matter now before the Court relates to a motion for a new trial filed on behalf of the plaintiff.

### History of Instrumentality Which Caused the Disaster.

The tragic accident in which Patrick J. Moran lost his life was a poignant episode in the development of the bold and ingenious engineering for which Americans have become famous. The East Ohio Gas Company is an operating public utility engaged in the selling of natural gas for industrial and consumers' use in the city of Cleveland, state of Ohio. A problem arose in connection with meeting the demands of the company for making available an adequate supply of natural gas, and the immediate problem was the storage thereof. A plan was worked out whereby natural gas at a temperature of 250° below zero Fahrenheit becomes liquid, and the condensation in volume was so great that 600 cubic feet of the natural gas became one (1) cubic foot of the liquid gas. Arrangements were made whereby three spherical tanks were constructed, commencing in the year 1940, sufficient to hold fifty million cubic feet of the natural gas. The success of this storage venture increased the demand for gas and resulted in East Ohio Gas Company in the year 1942 to look for a further expansion of storage facilities. The new tank to be built was to have storage capacity of two of the earlier ones or sufficient to hold 100 million cubic feet of natural gas.

### History of Construction of No. 4 Cylindrical Tank.

The Pittsburgh-Des Moines Company was engaged in the fabrication and design of tanks and materials. The Pittsburgh-Des Moines Steel Company secured business for the corporation and engaged in the construction of tanks and different instrumentalities that were designed and fabricated by the Pittsburgh-Des Moines Company.

The No. 4 cylindrical tank was constructed through contractual arrangements between East Ohio Gas Company and Gas Machinery Company. The Gas Machinery Company let a sub-contract to the Pittsburgh-Des Moines Steel Company for the design, construction and fabrication of the No. 4 tank. Although the contract was let by Gas Machinery Company with the defendant partnership, the defendant corporation and the individual defendant, John E. Jackson, a member of said partnership, were active and took part in one way or the other in the matters relating to the design, fabrication and construction of said tank.

East Ohio Gas Company executed the formal contracts for the construction of No. 4 tank with Gas Machinery Company since said company had certain patent rights which had to be recognized by East Ohio. Gas Machinery in turn sub-contracted with Pittsburgh-Des Moines Steel Company, the partnership defendant, for the actual design, fabrication and construction of the tank.

Due to the overlapping of the many business relations between the corporate defendant, the partnership defendant and the individual defendant, the Court left for the determination of the jury whether or not one or all of the defendants were involved in the construction of the No. 4 cylindrical tank, and if one or all of the defendants were responsible for the catastrophe which caused the death of Patrick

J. Moran. That is, which one or all of the defendants, severally or jointly, engaged in the design, fabrication and construction of the No. 4 cylindrical tank, and whether or not the affairs of one or all of the defendants were so interwoven and intermingled that the acts of one became the acts of the others.

Tank No. 4 was completed in May of 1943, and after the tank was filled, the defendants were paid and left the job. All went well for nearly thirteen months when on the afternoon of October 20, 1944, No. 4 tank ruptured and gas escaped in great quantities. There was a fire, an explosion and a frightful disaster in which lives were lost and property destroyed. One of the lives was that of the plaintiff's decedent, who worked with the East Ohio Gas Company but not in the operation connected with the liquefaction and storage of gas.

### Applicable Law.

Federal jurisdiction is based solely on diversity of citizenship, and the familiar situation exists in which the federal court applies state law and takes its law from the authorized decisions of the state where the action arose. Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

In diversity of citizenship cases, the federal courts, when deciding questions of conflict of laws, must follow the rules prevailing in the states in which they sit. The conflict of laws rule to be applied must, therefore, be determined by the law of Pennsylvania. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Alcaro et al. v. Jean Jordeau, Inc., 3 Cir., 138 F.2d 767; Smyth Sales v. Petroleum Heat & Power Co., 3 Cir., 128 F.2d 697; Boyle et ux. v. Ward, 3 Cir., 125 F.2d 674; Anthony P. Miller, Inc., v. Needham et al., 3 Cir., 122 F.2d 710.

In view of the foregoing, the question arises—What is the Pennsylvania rule of conflict of laws relating to recovery upon a tort claim where the facts have occurred outside of Pennsylvania?

The Pennsylvania rule is that the liability of the defendant is to be based on the place of the tort or the wrong. Boyle et ux. v. Ward, Supra.

For purposes of diversity jurisdiction, a federal court is in effect only another court of the state. The questions which, therefore, arise as to the plaintiff meeting the burden of proof required to support a right to recover was governed by the law of Ohio. Stoner v. New York Life Ins. Co., 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284; Cities Service Oil Co. v. Dunlap, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196; Woods v. Interstate Realty Co., 69 S.Ct. 1235.

The substantive rights of the parties are determined by the law of Ohio where the tank was built and the catastrophe occurred, since under the law of conflicts the Ohio rule controls. Boyle v. Ward, supra; Alcare v. Jean Jordeau, Inc., supra; Smyth Sales v. Patroleum Heat & Power Co., supra.

Since the catastrophe occurred in Ohio, the question is one of tort law, and under the law of Pennsylvania it is necessary to look to the Ohio authorities to determine the law. Moran v. Pittsburgh-Des Moines Steel Co., et al., supra.

The Ohio courts have ruled that a manufacturer is responsible not merely to the consumer of the article, but also to a person in the vicinity of its use who is injured by the manufacturer's lack of due care. White Sewing Machine Co. v. Feisel, 28 Ohio App. 152, 162 N.E. 633; Moran v. Pittsburgh-Des Moines Steel Co., et al., supra; Gilbride v. Laffel Co., Ohio App., 47 N.E.2d 1015.

The appellate courts in Ohio have not definitely ruled on the question as to whether or not the principle of liability just enunciated would have application to a chattel attached to the real estate, and which is out of control of the party who constructed or attached the chattel. However, the Circuit Court held that if the Ohio courts were confronted with the problem, they would in accordance with the development of the law shown in its previous decisions, extend the liability of the manufacturer to negligence involved in building the structure even though that

structure was affixed to another's land. Moran v. Pittsburgh-Des Moines Steel Co., et al., supra.

Many questions arose in the trial of the case as to whether the admissibility of evidence was to be governed by the law of Ohio, Pennsylvania, or the Federal Rules. Since the admissibility of evidence, in the absence of a statutory requirement or restriction, and none existed in this action, is a matter of procedure rather than substance, the Court applied Rule 43(a) of the Federal Rules of Civil Procedure, 28 U.S. C.A.

"Rule 43. Evidence

"(a) Form and Admissibility. In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules. All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made. The competency of a witness to testify shall be determined in like manner."

As a result testimony was admitted which was proper under the rules of evidence heretofore applied in the courts of the United States, or which was admissible under the rules applied in the courts of Pennsylvania.

The plaintiff's motion for a new trial is premised generally under five different classifications:

I. The refusal of the Court to submit the issue of negligence in designing and building Tank No. 4 in a cylindrical form.

II. Rulings of the Court in reference to the testimony of James O. Jackson.

III. Error in exclusion of evidence offered by plaintiff.

IV. Error in admission of evidence offered by defendant.

V. Error in the instructions to the jury.

In order to thoroughly and intelligently consider the various questions which have been presented by the plaintiff in the motion for new trial, each general topic and sub-classification which is set forth will be evaluated separately.

I. The Refusal of the Court to Submit the Issue of Negligence in Designing and Building Tank No. 4 in a Cylindrical Form.

Said claim of negligence is set forth in the second amended complaint. The plaintiff alleged that the defendants were guilty of recklessness and negligence in the following respects, to wit:

"(a) In designing and constructing said tanks, and particularly the cylindrical tank without adequate outside dykes for each tank so as to retain said liquid gas in the event of a rupture of the walls of any tank.

"(b) In providing and using steel of such defective composition and improper treatment that it was of insufficient strength and toughness to resist the strains created in said tank when filled with liquid natural gas, and was likely to be brittle and to rupture upon slight impact or strain, and particularly in using steel which was defective and which failed to conform to the specifications required in the following respects:

"(aa) It had a 'Charpy Impact Test Strength' of such a low character that it was brittle at the temperatures of liquid natural gas and wholly unfit for use in such a tank; and showed an actual 'Charpy Impact Test Strength' of about 2 or 3 foot lbs. whereas the specifications required a test strength of not less than 10 foot lbs; and said specifications should in fact have required a test strength of not less than 15 foot lbs.

"(bb) It was of an excessively coarse 'grain.'

"(cc) It was improperly 'banded' so that it was likely to fracture and break in one plane.

"(dd) It contained an excessive amount of impurities so that said steel was 'dirty'

within the meaning of that expression in the manufacture of steel.

"(ee) It contained more carbon than was proper and too little nickel, in the alloy.

"(ff) It had not been properly 'normalized.'

"(gg) It had not been adequately or accurately tested as to impact strength before being placed in said tank.

"(c) In designing and building said tanks at a place where there was almost continuous vibration and ground termors, such that the rock wool used as insulation for the cylindrical tank was likely to disintegrate and collapse and to lose a substantial part of its insulating effect; and so that the steel of the tank was likely to become fatigued and be rendered increasingly brittle and subject to fracture.

"(d) In failing to reduce the strains and stresses which had been created in said cylindrical tank in the process of erecting it and welding its constituent parts, by an appropriate heat treatment, peening or otherwise.

"(e) In so designing and constructing said tanks that any spillage or drainage therefrom would be drained into a covered pit or sump, and in failing to provide an anti-flashback guard for the said pit.

"(f) In designing the said tank so defectively and improperly that great internal strains were set up by the presence of liquid gas therein, which strains were due to the differences in contraction of the component parts of said tank.

"(g) In designing and constructing the connecting pipes and valves which connected the various tanks with the general liquefying system of said plant in such a manner that there was inadequate protection against sudden surges of pressure in said tank.

"(h) In designing and constructing said cylindrical tank in such a manner that no device was provided for agitating the liquid contents thereof or otherwise protecting against the hazards of vapor pressure within said liquids, and so as to avoid the hazards of surge or 'bumping' arising therefrom.

"(i) In failing to design or provide an effective cushioning device to protect the said cylindrical tank and its constituent members, and particularly the inner shell thereof, from the dangers of continued vibration and the fatigue resulting therefrom.

"(j) *In designing and constructing said fourth tank in the form of a cylinder instead of a sphere when said cylindrical form was likely to rupture when put to the use for which it was designed; and in further constructing said cylindrical tank without adequate engineering data warranting its substitution for the spherical form which had been formerly used.* (Emphasis supplied.)

"(k) In failing to provide adequate supports or materials of sufficient strength to support the weight of said cylinder and its liquid contents, and in failing further to make adequate laboratory tests to determine the effect of extremely low temperatures upon the materials thus used in the presence of the strains incidental to the weight and support of such a structure and the vibrations encountered at the site of said tanks.

"(l) In using for insulation in the cylindrical tank a substance untested for such purposes, and which the defendants knew or ought to have known was likely to disintegrate and lose much of its insulating value, and in failing to provide adequate insulation between the inner and outer walls of said tank.

"(m) In so designing and erecting said cylindrical tank as to make it difficult, if not impossible, to keep the insulation in proper position or to replace defective insulation or to repair adequately leaks in the structure of said tank when such leaks should appear.

"(n) In failing to make adequate tests of the effects of liquid gas upon the materials and alloys used in said structure before attempting to erect said plant and particularly the cylindrical tank.

"(o) In designing, planning and erecting said tanks at a place and in such close proximity to each other that any leakage

from one or the other of said tanks was likely to cause conflagrations and explosions in the other tanks.

"(p) In so designing said tanks without any adequate safety devices or safeguards around them so as to permit said gas, in the event of leakage, to be protected against fires and explosions; and particularly in failing to equip said tanks with outside sprinkler systems or with Fosmite or carbon dioxide safety provisions.

"(q) In so designing and constructing said tanks that there was no adequate provision to give warning by automatic machinery or otherwise of the fact that leakage was taking place, or that a rupture or fracture of the inner shell of said tank had taken place.

"(r) In giving instructions to the employees of The East Ohio Gas Company after leakage from the cylindrical tank had begun, to cause the frost spots resulting from said leakage to be removed by the process of applying steam blowers, when said process was hazardous and dangerous and was likely to cause ruptures to be en larged and made more dangerous; and when further, said employees of The East Ohio Gas Company ought to have been instructed immediately to withdraw said liquid gas from said tank.

"(s) In designing said system of tanks in such a manner as to fail to provide a spare or storage tank available for the storage of liquid gas in the event that one of said tanks developed ruptures or leakage, such as to require an immediate and early emptying thereof.

"(t) In failing to give proper warnings to the employees of The East Ohio Gas Company or to the general public of the great hazards involved in working in or about said plant."

In brief, it is the plaintiff's contention that it was error to reject testimony which would establish that the No. 4 cylindrical tank was not as safe, or that it was more dangerous than if a spherical tank had been constructed—this testimony to prove either or both of the following theories:

(a) That said action on the part of the defendants was evidence to be considered by the jury in determining whether negligence existed.

(b) That said action on the part of the defendants constituted negligence.

It is urged that this question was adjudicated affirmatively in plaintiff's favor by the Circuit Court, and that the trial judge failed to follow the mandate of the appellate court. No objection was made by the defendant during the first trial to evidence being presented in support of said allegation of negligence, but strenuous objection was presented at the retrial.

In connection with the question as to the trial court being bound by the mandate of the Circuit Court relative to the allegation of negligence, "the use of a dangerous cylindrical form for tank No. 4 instead of the spherical form," the defendant contended that the matter was not argued before the Circuit Court and that, therefore adjudication was not made of this question, and it was proper to object to testimony introduced to establish said allegation of negligence. The defendants' contention seems to be supported if reference is had to the reply brief of the appellant where the plaintiff states that the defendants do not attempt to dispute or explain in any way any specific items of negligence. The only consideration which the Circuit Court gave to the specific items of negligence was a statement that it was believed that there was sufficient evidence in the record to require their submission to the jury, and to pass upon the question whether the jury would believe the evidence and draw the inference of negligence therefrom.

Although reference was made by the Circuit Court to said allegation of negligence, it appears from a reading of the various paper books which were filed by the respective party litigants and the opinion of the Circuit Court, that said basis for negligence was not argued before the Circuit Court. A firm rule was not made by the Circuit Court as to whether or not evidence was admissible to establish lack of due care or the existence of negligence on the basis of said allegation.

It was, therefore, proper for the defendant to object to said testimony, and that the

disallowance of proof to establish negligence on said basis was required by the settled rules of law which govern actions based on negligence.

■■■ I, therefore, do not believe that I neglected to follow the mandate of the Circuit Court, but, on the contrary, it was my duty to pass upon the question when presented by the defendants.

The plaintiff alleged as an act of negligence that the defendants were negligent in designing and constructing said No. 4 tank in the form of a cylinder instead of a sphere, which said cylindrical form was likely to rupture when put to the use for which it was designed, and in further constructing said cylindrical tank without adequate engineering data warranting its substitution for the spherical form which had been formerly used.

This action is governed by the law of negligence.

■■■ Negligence is failure to conform to the standard of a reasonably prudent man, or, broadly speaking, a departure from the normal, or what should be the normal. It cannot be established by showing that had the actor acted otherwise, no accident would have happened. Eckenrode v. Penna. R. R. D.C., 71 F.Supp. 764, 3 Cir., 164 F.2d 996, 335 U.S. 329, 69 S.Ct. 91, 92 L.Ed. 1144.

The definition of negligence has become common place in the law that negligence is a failure to do what a reasonably prudent person would ordinarily have done under the circumstances or the situation, or doing what such a person under existing circumstances would not have done. Baltimore & P. R. Co. v. Jones, 95 U.S. 439, 24 L.Ed. 506.

The same rule exists in Pennsylvania and Ohio, and no useful purpose would be gained in making reference to the various authorities in those jurisdictions.

The three spherical tanks which were originally constructed were designed to each hold substantially 50 million cubic feet of gas, or if the gas were liquidified 100 thousand tons. The cylindrical or the No. 4 tank was to hold 100 million cubic feet of natural gas or a weight of liquid,

when the gas had been liquefied, of 200 thousand tons. In other words, the cylinder was to hold double the amount of gas or liquid held by the spherical tanks.

Prior to the construction of the spheres or the No. 4 tank, there was never any custom established relative thereto or for the welding of tanks for storage of large quantities of liquefied natural gas at a low temperature of 258 to 280° below Zero F.

As to the No. 4 cylindrical tank, a similar one had never been constructed or used for the storage of liquid gas. Also, a spherical tank had never been used to store the amount of liquid gas required by the No. 4 cylindrical tank. It was a step forward in the development of ingenious engineering in this particular field of scientific advancement.

No offer was made by the plaintiff to establish that if a spherical tank had been constructed to hold twice the amount of gas which the three spheres had held, that the spherical tank would have been safer or better than the No. 4 cylindrical tank.

Unless there is a safer method available or it has been established in the custom or trade that the safety factor would be promoted by the use of a sphere rather than the cylinder, or that the hazard was increased by the use of the cylinder rather than the sphere, negligence cannot be inferred from the failure to do an act in some other way not shown to be safer. Wood et al. v. Philadelphia Rapid Transit Co., 260 Pa. 481, 104 A. 69, L.R.A. 1918F, 817.

■■■ Where prudent, careful and cautious men, equally competent to judge of a difficult and doubtful situation, hold dismetrically opposite views as to which of the two courses is safer, the adoption of either course cannot be negligence. In such cases there is no normal from which to depart. Boston Cape Code & New York Canal Co. v. Seaboard Transp. Co., 1 Cir., 270 F. 525, certiorari denied 256 U.S. 692, 41 S.Ct. 534, 65 L.Ed. 1174.

■■■ Evidence as to whether or not a given instrumentality is safer or better than the one that has been used, in my judgment, is not proper to be considered as

to whether or not negligence exists, unless it is first established that a custom or a usage exists that a certain or given instrumentality is safer or better than another condition or instrumentality. Therefore, evidence of one isolated case where there has been no previous custom or usage, and where the situation relates to the opinion of one person dominating over that of another is not admissible to establish said isolated condition is best or better than another.

██ The standard of due care is such care that a prudent person can exercise under circumstances of a particular occasion, and conformity to customary or usual conduct or methods cannot amount to more than circumstances to be considered together with other circumstances in the case in determining whether due care has been exercised.

██ Usage, customary methods and customs, although they do not furnish a test which is conclusive or controlling over the question of negligence or fix a standard by which negligence is measured, they may be treated as factors of measurement of due care. They cannot be treated to the extent of justifying a custom so obviously dangerous to life and limb as to be at once recognized as such by all intelligent persons. Price v. New Castle Refractories Co., 332 Pa. 507, 3 A.2d 418; MacDougall v. Pennsylvania Power & Light Co., 311 Pa. 387, 166 A. 589; Fox v. Keystone Telephone Co., 326 Pa. 420, 192 A. 116, 110 A. L.R. 1182; Earl D. Diesbourg v. Hazel Atlas Glass Co., 3 Cir., 176 F.2d 410.

It does not appear to make any material difference whether the application of the rule of law just enunciated is governed by Ohio, Pennsylvania or federal law since they all show adherence to the general rule as stated. For Penna.—MacDougall v. Penna. Power & Light Co., supra. For Ohio—Ault v. Hall, 119 Ohio St. 422, 164 N.E. 518, 60 A.L.R. 128; Ribarin v. Kessler, 78 Ohio App. 289, 70 N.E.2d 107. Federal —Earl D. Diesbourg v. Hazel Atlas Glass Co., supra; 45 Corpus Juris, Para. 89, pages 706, 707, 708 and 709.

If evidence had been introduced to establish that the construction of a spherical tank for the storage of liquid gas in the amount to be stored in the cylinder had been accepted in the industry or trade, and as a result thereof a practice, custom or general usage existed in said type of business, I believe it would then have been proper to show that the spherical tank was more secure, better and safer than the cylindrical tank. On the contrary, however, I believe it is improper to permit said proof on the basis of one isolated instance where difference of opinion exists, and there has been no acceptance as a practice, custom or general usage in the business that as to the one isolated instance the approach made was safer or better than the one which was used. If there had been a common usage in trade or practice of the business relative to the construction of a tank to hold liquid gas, then the testimony would be admissible to be considered as a test of negligence although it would not be conclusive or controlling. Carthe v. Ruppert, 264 N.Y. 290, 190 N.E. 643; Standard Oil Co. v. New York v. R. L. Pitcher Co., 1 Cir., 289 F. 678, 685; Miller v. Philadelphia, 345 Pa. 1, 25 A.2d 185.

The plaintiff's offer does not even fall within the rule just enunciated for the reason that the testimony did not establish that had the spherical tank been constructed in lieu of the No. 4 cylindrical tank, it would have been sufficient or satisfactory for the purpose intended. It must be kept in mind that the cylindrical tank was twice the size of the spherical tank. The steel used in the cylindrical tank would have been subject to twice the load of the steel used in the spherical tank, and there are many other items of design, fabrication and construction of the various elements and materials used in the cylindrical tank that had not been heretofore tested or commercially used in the spherical tank of the size sufficient to store 100 million cubic feet of natural gas, the size of the cylindrical tank.

There was no custom, usage or practice in the trade or business wherein there was accepted or known that a spherical tank would hold 100 million cubic feet of natural

gas or be suitable or fit for the purpose intended.

That in the absence of custom, usage or practice in the business or industry, evidence as to one instrumentality being safer or better than another is not negligence, and cannot be used as a basis in determining whether or not negligence exists. That the doctrine to be applied is the exercise of due care, caution and prudence under the circumstances, and evidence as to what is safer or best is irrelevant.

Since experts and engineers trained in the field, all of whom were competent to judge a difficult and doubtful situation, held diametrically opposite views as to whether a cylindrical or spherical tank was safe, even as to a tank one-half the size of the cylindrical tank, the adoption of either course or the failure to adopt either course cannot be held as a matter of law to be a lack of due care or negligence, nor it is evidence of negligence.

It is apparent from the testimony offered by the plaintiff that the experts, who expressed their opinion when inquiry was made as to whether a cylindrical tank could be designed with safety and built of suitable materials, in each instance made the answer that if they had the choice or the selection, they would construct or build spherical tanks.

. The rule of law presented by the plaintiff that "if there were two methods equally opened to performing the act, one of which would be a reasonably safe one and the other an extremely hazardous one, it would be his duty to adopt a reasonably safe method" cannot apply to the questions before the Court for the reason that there is no proof offered to establish that the spherical tank would be, from a practical standpoint, safer than the cylindrical tank. There was no custom, usage or practice in the industry since the construction of the cylindrical task was pioneering the field and the spherical tanks had only been used for one-half the storage volume that was to be charged to the cylindrical tank. There was a difference of opinion existing among the experts as to which tank was more acceptable or satisfactory for the purpose intended, and, therefore, the testimony that the spherical tanks were better or safer than the cylindrical tank was improper as a matter of law, and should not have been considered by the jury in determining whether negligence existed or defendants exercised due care and caution under the circumstances.

An expert cannot be permitted to testify whether or not a certain practice was a safe one, though he may, if properly qualified, testify whether or not the common usage of a business had been adhered to by the defendant. Sweeney, Appellant, v. Blue Anchor Beverage Co., 325 Pa. 216, 189 A. 331.

It is my conclusion that it is improper to establish negligence, where a custom or usage has not heretofore been established, that some other instrumentality or approach might have been better or the best where only isolated instances exist. The construction of the tanks for the storage of liquid gas was a new venture since liquid gas had not heretofore been stored or used for storage prior to the construction of the spherical tank. A situation, therefore, existed which amounted to pioneering and, therefore, no custom or practice could possibly have existed in the trade or business of this nature. In negligence cases the test is always what a person of ordinary caution would have used under the circumstances. It is one of the common places of the law. Texas & Pacific Railway Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905.

If a person has acted with ordinary prudence and judgment, he is not negligent although danger might have been avoided if he had acted in a different manner, and, hence, the doing of an act in a certain manner is not necessarily negligence merely because there may have been a safer manner of doing it. Negligence, therefore, cannot be inferred from failure to do an act in some other way, not shown to be safer than the way in which it was done; and when prudent men differ as to which of the two courses is safer, negligence cannot be predicated on the adoption of either. 45 Corpus Juris, Para. 70, pages 698, 699.

Furthermore, there was no obligation existing upon the defendant to use a better method or best method, but only to use due care and caution under the circumstances. In the trial of this proceeding where the plaintiff offered testimony to establish or show that some of the features of the cylindrical tank were improper, or that other features of the cylindrical tank would not be sound from an engineering or construction standpoint, such evidence was admitted in order to assist the jury in determining whether or not due care and caution was exercised. In short, there is considerable testimony in the record to establish that the steel used in the cylindrical tank was improper, the insulation was faulty, the design was bad, the valves were not adequate, and numerous other references which tended to prove that the design and construction of the cylindrical tank was improper.

There is no authority which I have been able to find, and none has been presented by counsel for either party, which holds that negligence can be established by proving the use of one instrumentality is safer or better than another instrumentality which was used. The plaintiff has invoked the doctrine set out in railroad cases which holds that a pedestrian must accept the safe way for one that is known as dangerous. In applying this doctrine, it must first be established that there is a known safe way and that there must be known a dangerous way. Storovetsky v. Pennsylvania R. R., 328 Pa. 583, 195 A. 871.

There is no testimony in this record that the spherical tank was safe, and the same type of steel was used in both the spherical and the cylindrical tanks.

I, therefore, do not believe that the railroad cases' doctrine has application to the facts in this case.

■ I believe the test of negligence as outlined by the Court and the rulings made relative to the admission of evidence were proper since the test of negligence is whether or not ordinary care and caution was exercised under the circumstances. The jury was properly, fairly and thoroughly instructed as to the doctrine of negli-

gence, and the refusal to permit evidence as to the spherical tank being safer or better than the cylindrical tank was proper.

II. Rulings of the Court in Reference to the Testimony of James O. Jackson.

Permitting defendants to re-examine Jackson after he was called for cross examination by the plaintiff on matters wholly unrelated to the patents which was the subject of plaintiff's examination—

This examination was authorized under provisions of Rule 43(b) of the Federal Rules of Civil Procedure which provides, inter alia, that a party may call an adverse party or an officer, director or managing agent of a private corporation, or of a partnership which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination.

The plaintiff requested the right to cross-examine James O. Jackson on the ground that he was an officer of defendant corporation and the managing agent of defendant partnership. The defendant denied that he was either an officer or a managing agent of the defendant partnership, and in view of his testimony relative thereto, the Court permitted his cross examination as the managing agent of the defendant corporation.

It is my judgment, from a reading of the record and my observation at the time Jackson was called for cross examination, that at the time the cylinderical tank was designed, fabricated or constructed, he was managing agent only of the defendant corporation. He was not an officer of the corporation during said period and he specifically was not a managing agent, a partner or an officer of the defendant partnership.

■ No prejudicial error could have possibly arisen to the plaintiff in limiting the cross examination of Jackson to the defendant corporation, since in final analysis the trial court in its charge left for the jury the determination as to whether the

acts of Jackson were those of the defendant corporation, the defendant partnership, and/or the individual defendant.

The cross examination of Jackson relative to the patents and applications for patents was made to show the requirements with reference to the necessity of strong steel, with high impact strength of at least a minimum of ten pound Charpy impact strength, in the plates and welds of tanks for the storage of liquefied natural gas. The further purpose of offering the cross examination was to establish from a substantive standpoint that in order to construct a proper tank, it was necessary to comply with the matters referred to in the patents and the applications, and that since there was a failure to so comply, the tank was improper and the jury should draw the inference that the defendants were guilty of negligence. In short, the purpose of the cross examination was to establish that since the defendants failed and neglected to comply with the terms and provisions of the patents or the applications that the steel, the welding, the construction and design of the No. 4 cylinderical tank was improper and, therefore, negligence existed.

Considerable argument and discussion was had as to the right of the defendants to examine Jackson relative to the matters testified to on cross examination. It was the defendants' position that the right existed to examine the witness relative to his intentions, his beliefs and the basis for the expression of the matters which appeared in the applications and the patents finally issued. The defendants premised their rights on the basis of Pennsylvania authorities. Felski, Appellant v. Zeidman, 281 Pa. 419, 126 A. 794; Kline v. Kachmar, Appellant, 360 Pa. 396, 61 A.2d 825.

■ As to the rights of examination where an adversary is called for cross examination, whether the adversary is a defendant or a representative of the defendant, the Pennsylvania authorities do not have application where a proceeding is being tried in a federal court. The federal rule must be applied. Cyclopedia of Federal Procedure, 2nd Edition, Volume 7, Section 3153; Moyer v. Aetna Life Ins.

Co., 3 Cir., 126 F.2d 141; Zumwalt v. Gardner, 8 Cir., 160 F.2d 298.

■ In determining the extent to which an adverse party, or an officer, director or managing agent of an adverse party, who is called for cross examination under the provisions of Rule 43(b), may be cross-examined by the adverse party, it is necessary to consider only the subject matter of the cross examination. It is proper to permit an examination which will bring out or establish any fact tending to contradict, modify or explain the testimony given by the witness during his cross examination. A party, therefore, has the right to cross-examine a witness on the facts and circumstances connected with the matters stated in the direct examination. Moyer v. Aetna Life Ins. Co., supra; Mintz v. Premier Cab Association, 75 U.S. App.D.C. 389, 127 F.2d 744.

■ It is furthermore competent and proper on cross examination to develop all facts and circumstances within the knowledge of a witness which qualify or destroy the testimony developed, although, strictly speaking, the examination may constitute new matter and is part of the case of the person who desires to explain said testimony. Banning v. United States, 6 Cir., 130 F.2d 330, certiorari denied 317 U.S. 695, 63 S.Ct. 434, 87 L.Ed. 556.

■ If the questions do not go outside of the subject matter of the examination in chief where a witness is called for cross examination, the inquiry which can be made may be full and exhaustive; that is, the examination can be made to elicit every fact relative to the matters testified to during cross examination which either conditions, qualifies or weakens the statements there made. Resurrection Gold Mining Co. v. Fortune Gold Mining Co., 8 Cir., 129 F. 668; Commercial State Bank v. Moore, 8 Cir., 227 F. 19; Banning v. United States supra; Radio Cab v. Houser, 76 U.S.App.D.C. 35, 129 F.2d 604; Moyer v. Aetna Life Ins. Co., supra.

■ The rule, therefore, in the federal court seems to be that the limitation upon the scope of cross examination to the subject matter which was referred to during

the examination in chief is to be applied, and if a party wishes to examine witnesses regarding other matters, he must do so by making the witness his own and calling him as such in the subsequent progress of the trial. Kineade et al. v. Nickles et al., 8 Cir., 144 F.2d 784; Moyer v. Aetna Life Ins. Co., supra; Wills v. Russell, 100 U.S. 621, 625, 25 L.Ed. 607; Philadelphia & Trenton R. R. Co. v. James Stimson, 39 U.S. 448, 10 L.Ed. 535; Radio Cab v. Houser, supra.

In the exercise of my discretion, I believed such action was necessary in regulating the examination of said witness so as to expedite the trial, elicit the truth and further justice. Cafasgo v. Pennsylvania R. Co., 3 Cir., 169 F.2d 451.

■ It was proper for the defendant to examine the witness upon those particular subjects which were referred to in either the patents or the applications, and unquestionably, in my mind, the cross examination related to subjects upon which the witness had been examined and upon subjects mentioned in either the applications or the patents. The examination permitted by defendants' counsel was necessary in order to meet the testimony, and the inferences which rightfully could have been drawn by the jury from the matters which appear in the applications or the patents that the steel was bad, the welding improper, or that the structure was not constructed in accordance with the thoughts and ideas expressed therein.

The subject matter of the examination permitted by the defendants was proper since it related to the general subjects about which inquiry was made by the plaintiff through the cross examination of said witness.

■ The plaintiff contends that the Court erred when it instructed the jury that the only question for the jury's determination was whether or not the tank as designed was reasonably safe. There is no statement in the record wherein the Court stated or instructed the jury that the only obligation of the defendants was to build a tank which was reasonably safe, and I am at a loss to understand why counsel for the plaintiff invokes such an argument. The only reference to such phraseology appears in the examination by counsel for the plaintiff made of witnesses called by him. There exists absolutely no merit in this cause of complaint.

Instructions to jury that plaintiff was bound by Jackson's testimony to the extent that it was not rebutted—

The Court instructed the jury relative to this question that—"Where a party litigant calls his adversary or a managing agent of the opposite party to testify as upon cross examination, while the testimony obtained is not conclusive on the party who called said person, for the reason that it may be rebutted by other proof, yet to the extent that testimony as produced from a person called for cross examination is not rebutted by either direct proof or circumstances, it is conclusively taken to be true. The Court further stated that if the plaintiff has offered other proof, either direct or by circumstances, to show what Jackson stated wasn't true, then the plaintiff could not be bound by the testimony; but if the plaintiff has not offered other proof or circumstances to show that anything which Jackson stated as on cross examination to rebut his testimony or by circumstances, then what he stated as on cross examination would be binding upon the plaintiff."

There was ample testimony in the record wherein the testimony of Jackson as presented on cross examination was contradicted, and in fact in many instances Jackson contradicted himself. The Court at no time stated that any part of Jackson's testimony was not contradicted nor that the jury as a matter of law was bound by any part of Jackson's testimony. The question, therefore, as to whether any part of Jackson's testimony would be accepted was left for the determination of the jury together with the question as to whether or not he had been contradicted in any respect either by testimony or by circumstances. Cardone v. Sheldon Hotel Corp., 160 Pa.Super. 193, 50 A.2d 700.

Counsel for the plaintiff argues that the charge which the Court gave to the jury was premised on the basis of Pennsylvania

law which does not have application to the question which has been raised.

The law in Pennsylvania is settled that where a litigant calls his adversary to testify as upon cross examination, while the testimony thus obtained is not conclusive on the party who calls the witness, yet to the extent that it is not rebutted it is conclusively taken to be true. Kline v. Kachmar, supra.

This question was presented to the Circuit Court at the first appeal. The Court stated, "We do not think that there is involved, at this stage at least, any serious question which requires us, at this point, to thread our way through the Pennsylvania decisions under the statute." Comment was also expressed by the Court, "This witness gave certain testimony as to possible causes for the accident * * * [his testimony was] flatly denied by other witnesses." Moran v. Pittsburgh-Des Moines Steel Co., et al., supra [166 F.2d 919].

The plaintiff places reliance on a statement which appears in the Cyclopedia of Federal Procedure, 2nd Edition, Volume 7, Section 3153, wherein it is stated, "Although the language of the rule is somewhat involved, the obvious intent is that none of the parties (except, necessarily, the witness himself is a party) shall be bound by the testimony of a witness as called in this manner."

The matter just referred to is an interpretation by the writer of said publication and it is not a part of the rule, and cites no authority to support the statement.

With due deference to the author of the Cyclopedia of Federal Procedure, wherein he stated in Section 3153, Volume 7, relative to Rule 43(b) where an officer, director of managing agent of a corporation is called for cross examination, "Although the language of Rule 43(b) is somewhat involved, the obvious intent is that none of the parties shall be bound by the testimony of a witness called in this manner," I do not believe that such interpretation is sound or reasonable. Cross examination of any party or witness is known and has been observed by trial judges to be one of the most dangerous and indefinite privileges that arise in the trial of a case. It appears to me that if a party calls a managing agent, officer or director, as for cross examination under the provisions of Rule 43(b), he speculates or takes a chance as to whether testimony can be elicited from the witness which will be favorable to the cause of the party as a witness. If testimony is offered which is favorable, it definitely can be used and is available to support the claim of the party who calls the witness. In the application of sound logic and reasoning, it is difficult for me to believe that when this rule was promulgated it was intended that the party who called said witness would be permitted to take advantage of all testimony that was favorable and disregard any testimony which would be unfavorable or prejudicial to the basic claim of the party who called the witness. In other words, 99% of the testimony elicited could be favorable, and 1% unfavorable, and under the thought which has been expressed, the party who calls the witness could accept 99% and reject the 1%.

Rule 43(b) of the Federal Rules of Civil Procedure provides, inter alia, that a party may call an adverse party or an officer, director, or managing agent of a private corporation or of a partnership which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, *and may be cross-examined by the adverse party only upon the subject matter of his examination in chief*.

The phraseology used in Rule 43(b) is analagous to that used in the Pennsylvania rule, said rule provides, inter alia, that in any civil proceeding any person whose interest is adverse to the party calling him as a witness, may be compelled by the adverse party to testify as if under cross-examination, subject to the rules of evidence applicable to witnesses under cross-examination, and the adverse party calling such witnesses shall not be concluded by his testimony, but such person so cross-

examined shall become thereby a fully competent witness for the other party as to all relevant matters whether or not these matters were touched upon in his cross-examination. 28 Purdon's Penna. Statutes Annotated, § 381.

■ The general rule is that a party calling his adversary as a witness vouches, at least to some extent, for his credibility, and is concluded by his testimony so elicited if it is not contradicted or proved false, and this rule also applies to testimony so elicited from an officer, employee, or servant of the adverse party. 32 C.J.S., Evidence, § 1040(b); Zumwalt v. Gardner, supra; Wirfs v. D. W. Bosley Co., et al., 8 Cir., 20 F.2d 632; Swift & Co. v. Short, 8 Cir., 92 F. 567; Standard Water Systems Co. et al. v. Griscom-Russell Co., 3 Cir., 278 F. 703, certiorari denied 259 U.S. 580, 42 S.Ct. 464, 66 L.Ed. 1073; Abdo et al. v. Townshend et al., 4 Cir., 282 F. 476.

■ If the party calling the witness was not to be bound by the testimony offered where there has been no contradiction or impeachment of the witness, no useful purpose would exist for having the provision in the rule in which the party calling the witness is given the right to contradict and impeach the witness in all respects as if he had been called by the adverse party. This thought is given further weight by the additional provision of the rule which gives the adverse party the right to contradict and impeach the witness who has been called for cross examination. I believe the federal rule is the same as the Pennsylvania rule that where a party calls his adversary or an officer, employee or agent of the adverse party, the party who calls said witness vouches, at least to some extent, for his credibility and is concluded by his testimony as elicited if it is not contradicted or proof follows.

I believe the rule to be sound that where a party calls the managing agent, officer or director of his adversary, that said party cannot select that which is favorable and reject that which is unfavorable where he has not attempted to contradict the unfavorable testimony. 32 C.J.S., Evidence,

§ 1040(b), page 1105, Zumwalt v. Gardner, supra.

Refusal to admit the Jackson patents as substantive evidence—

The plaintiff established during the cross examination of Jackson that he had applied for and had issued to him certain patents. The plaintiff offered in evidence during the case in chief only one of the patents and read to the jury the statements which the plaintiff desired relative to the application for the patent together with the patent that was finally issued. The Court permitted said proof as substantive evidence on the basis of the offer of the plaintiff to establish and show that the defendant corporation failed and neglected to follow the terms and provisions of the patent or the application for the patent. This was permitted since said patent had been assigned to the defendant corporation prior and during the time that the No. 4 cylindrical tank was being designed, fabricated, and constructed, and amounted to an admission against interest on the part of the corporate defendant.

At the time the patents were first offered as substantive proof, the Court informed plaintiff's counsel that the patents or the applications for the patents would be so admitted if offered separately, and the plaintiff established two things:

(a) That the patents or the applications for the patents were applied for or issued prior to the time that the No. 4 cylindrical tank was constructed.

(b) That the patents or the applications for patents had been assigned to one defendant or the other before the No. 4 cylindrical tank was constructed.

Plaintiff's counsel, for reasons unknown to the Court, did not elect to establish the proof which was required at that time, or did he offer the patents separately, and proceeded to read depositions relative to other matters.

It must be understood that the many references to the patents or applications for patents were made at different times, and in some instances days and weeks elapsed between the times when inquiry was made relative thereto.

At a later date when the plaintiff had established the assignments to have been properly made to the corporate defendant, counsel for the plaintiff again neglected to offer them separately as substantive proof.

Reference to the record will reveal that the Court stated that all of the patents and applications would be admitted as substantive evidence. When the plaintiff closed its case, due to the many problems and questions which arose during the trial, the Court had no knowledge as to whether the exhibits had been separately offered and believed that the responsibility rested with the plaintiff as to what exhibits it desired to offer. It was not until the defendants had proceeded with the presentment of their case for some period of time that plaintiff's counsel offered the patents which had not been presented separately as the Court had requested. In fact, when they were offered, the Court commented, "Is it not true that these patents were previously admitted in evidence?" Since plaintiff's counsel had neglected to offer the patents in his case at chief and reference was being made thereto during the cross examination of defendants' witness, the Court admitted said patents during the defendants' case solely for the purpose of effecting the credibility of the witnesses called by the defendants.

It appears to me somewhat unusual for counsel representing a party litigant to endeavor to charge the Court with prejudicial error for the failure to admit exhibits where the situation is due to the fault or inadvertence of counsel. Some regularity of procedure and adherence to federal practice must be required by the court in the trial of a proceeding, and if plaintiff's position is sustained, it would tear down and severely interfere with the orderly trial of cases and administration of justice. I know of no rule, where previous favorable consideration has been given to the request of a litigant relative to the admission of testimony, which requires the Court, when no knowledge exists on the part of the Court as to why the offers were not produced, to permit counsel for said party litigant to introduce substantive evidence during the presentment of the defendants' case. Plaintiff's counsel has gone into considerable detail in his brief relative to the patents and their applications being admissible as substantive evidence to establish negligence, and plaintiff's counsel is correct and the Court so decided that they were admissible. The matter resolves itself into a situation where counsel neglected to do what the Court had authorized, and is now endeavoring to charge the Court with substantive error after an adverse verdict has been returned for acts or deeds which amounted to inadvertence and carelessness on the part of counsel.

At no time in the charge of the Court was the jury instructed that any of the patents would be considered only for the purpose of effecting the credibility of one witness or the other. Counsel for the plaintiff made reference to all of the patents or applications in his closing argument. Although I believe that no substantial or even technical error exists as to the admission of the patents or the applications since the situation arose due to the fault of plaintiff's counsel; if the Court is in error in this respect, plaintiff's counsel suffered no substantial prejudice. The applications and the patents were used throughout the trial and considered in the closing argument in the same manner as if plaintiff's counsel had done what the Court suggested, and had offered them separately before the closing of the plaintiff's case. In addition thereto, all of the patents made reference generally to the same problem, and the evidence was, therefore, merely cumulative as to the patents which the plaintiff did not offer as compared with the patent and application which the plaintiff did offer.

The best evidence is the approach which counsel made in his closing argument after making reference to the various patents. He stated—"There are other patents in evidence. A patent is an exclusive right given by the United States of America, in its sovereign power, to do certain things. And yet time after time after time, in four patents which we have in evidence and three other applications for patents, every time he said this tank must be made out of steel

which will have a Charpy impact strength of at least ten-foot pounds. Well, they didn't. This tank was made out of steel that averaged four and six tenths."

Again a situation exists where plaintiff's counsel is grasping for "straws" after an adverse verdict, to try and charge the Court with error due to a situation which was created on his own part, and any technical error which might exist, which I do not believe arises, relative to the patents was clearly relieved by the manner in which the patents were considered in the closing argument of plaintiff's counsel. Also, the jury had all the patents and the applications during their deliberation.

It would have been most improper for the Court to have questioned counsel for the plaintiff as to why certain things were done or not done in the presentment of his case. This is true since the Court had no way of determining why plaintiff's counsel did or did not offer testimony or exhibits at one time or the other.

In view of the argument of plaintiff's counsel to the jury relative to the patents and the applications, and the fact that all patents and applications were given to the jury during their deliberation, I cannot visualize or reason on what basis any substantial error arose to the plaintiff.

Refusal to admit the Jackson articles as substantive evidence—

The plaintiff offered as substantive proof two articles written by James O. Jackson, designated as Chief Engineer of the Pittsburgh-Des Moines Steel Company. The first one published in the Welding Journal in December of 1941, entitled "Welding Liquefied Natural Gas Storage Tank," and the second one published in the "Gas Age" in April of 1943.

It is contended the articles were admissible against the partnership since Jackson was managing agent at the time they were written and at the time of the trial was Vice President of the corporate defendant; that said publications were admissible as substantive evidence as admissions against interest. The defendants' objection is based on the fact that they were incompetent, irrelevant and immaterial as substan-

tive proof, and that the articles were written by Jackson as an individual rather than as a representative of the corporation or partnership, and that the identifying phraseology as Chief Engineer of the defendant partnership was used only to explain who the writer of the articles was. Further objection was made that Jackson was available to testify and that the articles could, therefore, be used only to cross-examine to attack his credibility in the event that he testified to facts which were different than those which appeared in the publications.

The Court ruled that the publications were not admissible as substantive proof, without prejudice to the right of the plaintiff during the examination of Jackson if he denied or contradicted any statements contained therein to introduce the exhibits in evidence to effect his credibility. Since Jackson was not Vice President of the corporate defendant at the time the articles were written, I do not see how under any theory they could be admitted as substantive proof against the corporate defendant. A further reason for not admitting the publications written by Jackson was that he was not a party defendant, and there was no evidence in the record to indicate the publications were written with the consent, approval or authority of any of the defendants and, therefore, could not be considered as an admission against interest on the part of any of the defendants.

As a practical approach, during the examination of various witnesses many parts of said articles were read to the jury. Said articles were admitted for the purpose of affecting the credibility of Jackson, and the articles were given to the jury during their deliberation and were referred to by plaintiff's counsel during his closing argument. I do not believe that any substantial error, therefore, exists in refusing the articles as substantive evidence and no possible harm or prejudice arose to the plaintiff.

Refusal to admit Jackson's statements as substantive evidence—

Although this point is set forth as a cause of complaint in the plaintiff's brief,

it is not discussed or is any reference made as to what the plaintiff contends to support ground for alleged error.

The only inference that I can draw is that the plaintiff is referring to the statements made by Jackson in the two articles published by him.

The reasons given by the Court in disposing of the admissibility of the articles written by Jackson would also apply to the admission of the statements made by Jackson in the articles. It amounts to the plaintiff saying the same thing in a different way.

Admission of hearsay evidence—

■■ In connection with hearsay evidence being permitted during the examination of witness Jackson, there is no merit in this complaint since the witness was only permitted to explain certain reports which were made available to him by other agencies relative to the technical and scientific investigation which was made as to the steel. It must be kept in mind that men in the field of science cannot make every investigation and research which is required in order to approach a given problem, and it becomes necessary for various persons or agencies to compile data and information on which is then referred to the scientist or the engineer for the purpose of assisting him in the evaluation and determination of the problem which exists. The Court only permitted the witness to explain his understanding of the various reports and research which were made relative to matters which were considered by the witness in reaching his conclusion. All of said records and tests were original in the nature and made in due course of the particular business of the person or company who made the test. Said records and tests were, therefore, admissible under the provisions of the Act of Congress of June 20, 1936, 49 Stat. 1561, 28 U.S.C.A. § 695; Palmer et al. v. Hoffman, Admr., 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719.

Although reference was made by the witness to copies of the reports, the original reports were available and plaintiff's counsel did not request that the originals be used at the time reference was made.

Refusal to permit cross examination of Jackson—

The plaintiff offered to prove that after the construction work was finished, the defendants learned that one heat of steel which had gone into the tank was so brittle that it rendered the tank dangerous and insecure; and that a discussion took place between some of the employees of either the corporate or partnership defendant with a representative of the Carnegie-Illinois Steel Company relative to this condition, and that this discussion showed knowledge on the part of either the corporate or partnership defendant of the dangerous condition of said heat of steel.

The defendant partnership had established a fellowship at the Mellon Institute for the purpose of research work, and men by the name of Stuchell and Garner were employed by the defendant partnership for said research work. Jackson had requested Stuchell and Garner to investigate with the Carnegie-Illinois Steel Corporation the problem which existed as to whether or not the steel produced by said company complied with specifications. A man by the name of MacLaren was directed by the Steel Company to confer with Stuchell and Garner. After said investigation was made, a conversation took place between Stuchell, Garner and MacLaren, and although MacLaren did not know whether it was Stuchell or Garner who made the statement, one of said men said to MacLaren, in the presence of the three individuals, that "if later tests on the steel should prove to be of the same low impact value as the previous tests, it would be necessary to remove the plates from the inner tank of the No. 4 cylinder which was being constructed." There was no testimony in the record that either Stuchell or Garner had the right to speak for one or all of the defendants, and there was furthermore no evidence in the record that Garner or Stuchell communicated said conversation orally, or in writing, to Jackson, nor is there any evidence in the record that Jackson had knowledge of said conversation.

In view of the fact that Jackson was not present when the conversation took place, or that any authorization existed on the part of Stuchell or Garner to speak for or bind any of the defendants, the Court believed that it would be prejudicial to permit such conversation being admitted in evidence.

■ In order to warrant the proof of admissions by an agent, one or more of the following facts must exist: It must appear that the agent was specifically authorized to make them; or his powers must have been such as to constitute him the general representative of the principal having the management of the entire business; or the admissions must have formed part of the consideration of a contract, or, if they are non-contractual, they must have been part of the res gestae. Campbell et al. v. G. C. Murphy Co., Appellant, 122 Pa.Super. 342, 186 A. 269; McGrath v. Pennsylvania Sugar Co., 282 Pa. 265, 127 A. 780.

■ Even a president of a corporation is without authority to concede on behalf of a corporation the cause of the accident and the responsibility for its happening; such admissions cannot be held to be binding on the corporation unless a part of the res gestae of the transaction. Burns et al. v. Jos. Flaherty Co., Appellant, 278 Pa. 579, 123 A. 496; Scheel v. Shaw, 252 Pa. 451, 456, 97 A. 685; Lombard Etc. Ry. Co. v. Christian, 124 Pa. 114, 16 A. 628; Giberson v. Patterson Mills Co., 174 Pa. 369, 34 A. 563, 52 Am.St.Rep. 823; Matteson v. New York Cent. & H. R. Ry., 218 Pa. 527, 67 A. 847.

■ The law generally seems to be that authority to do an act or conduct a transaction does not of itself include authority to make statements concerning the act or transaction, and that authority to make statements of fact does not of itself include authority to make statements admitting liability because of such facts. American Law Institute, Restatement Law of Agency, Section 288, page 647; 31 C.J.S., Evidence, § 351(3), 31 C.J.S., Evidence, §§ 354 and 355; 3 C.J.S., Agency, § 236, page 146; Dudley et al. v. Preston Motor Co., 6 Cir., 51 F.2d 8.

Under the rules established by the foregoing authorities, there can be no question that no authorization, implied or expressed, was given by Jackson to either Garner or Stuchell to make the statements. The statements were furthermore not part of the res gestae. Neither party was the general representative of the defendant corporation or any of the defendants, but was employed solely for a particular purpose, that is to determine if the heats of steel met the specifications of their order with the Steel Company. In addition, the witness to whom the statements were made did not know who made them, that is Garner or Stuchell, and only Garner was in a capacity where he could be considered as a managing agent of the defendant corporation or any of the defendants.

■ Since there was an entire absence of authorization to make the statements and it is indefinite who made them, their admissibility was improper.

An additional reason that the plaintiff was not substantially prejudiced is that counsel for the plaintiff in his closing argument to the jury made reference to said conversation, and asked the jury to draw inferences that after Stuchell and Garner had tested the steel they were astounded as to their findings and, in short, counsel expressed himself in this way: "Well, I don't know. I am now on my own. My inference is that they must have said to themselves that there are only two possible alternatives, there are only two things we can do. The tank is up. We have either got to pull her down or let her go. Those were the only two things they had. Here they are. They are faced with this horrible predicament, that from their own carelessness they built a heat of steel into that tank so brittle that it was just of substantially the order of glass. And that isn't my language. That is Jackson's—substantially of the order of glass. * * * Well, I know what they did. I know what they did. They let her go. They let her go."

In addition to this argument, considerable additional comment was made relative to said conversation, and due to the inflammatory expressions which were used rela-

tive to the evidence which had been ruled out of the case by the Court, when a motion to withdraw a juror was made by the defendants, the Court was somewhat puzzled as to what action to take. The motion was finally refused since the Court believed that due to the approximately nine to ten weeks that were involved in the trial of the action, it was not advisable to continue the case since great expense arose on the part of all parties. Due to the involvement of this prolonged action rather than withdraw a juror, the Court permitted the case to proceed. The Court gave counsel for the plaintiff the benefit of every doubt, and although it appears that counsel flaunted and utterly disregarded the ruling of the Court, rather than cause any embarrassment to the plaintiff or create any possible prejudice in the minds of the jury relative to the claim of the plaintiff, the Court did not reprimand or rebuke counsel. No such action was taken because the Court reached the conclusion that in the heat and passion of such an involved case, such statements were made by counsel in his closing argument unintentionally, but it could have been just as easy for the Court to have reached the opposite conclusion.

It is my judgment that the rule applied was proper. I do not see, therefore, even if the Court is in error relative to the ruling which was made, how any possible substantial error could arise to the plaintiff since the argument carried with it the same import and same value which would have existed if the testimony had been permitted.

### III. Error in Exclusion of Evidence Offered by Plaintiff.

Error in exclusion of the Bureau of Mines' Report—

This question has been subdivided by the plaintiff into five sub-topics:

(a) The Nature of the Report.

(b) The Rulings of the Court.

(c) The Portions of the Report Involved.

(d) The Question of Admissibility.

(e) The Relevance of the Report.

It is admitted that said report was formulated by an officer of the Bureau of Mines, which, in itself, is a bureau of the Department of Interior. Its rights to investigate the catastrophe or the accident are set out by an Act of Congress.

The duties of the Bureau of Mines, with reference to investigations and reports, are set forth in an Act of Congress. 30 U.S. C.A. §§ 3 and 5.

Title 30, Sec. 3: "It shall be the province and duty of the Bureau of Mines * * * to conduct inquiries and scientific and technologic investigations concerning mining, and the preparation, treatment, and utilization of mineral substances with a view to improving health conditions, and increasing safety * * * and to disseminate information concerning these subjects in such manner as will best carry out the purposes of Sections 1, 3, 5, 6, and 7 of this title."

Title 30, Sec. 5: "The Director of the Bureau of Mines shall prepare and publish * * * reports of inquiries and investigations, with appropriate recommendations of the bureau, concerning the nature, causes, and prevention of accidents, and the improvement of conditions, methods, and equipment, with special reference to health, safety, and prevention of waste in the mining, quarrying, metallurgical, and other mineral industries * * *."

The plaintiff further contends that said report was made in the regular course of business of the Bureau of Mines. The Federal "Business Records" Statute provides: Title 28, U.S.C.A. § 695 (Enacted June 20, 1936): "In any court of the United States * * * any writing or record, whether in the form of any entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of said act, transaction, occurrence, or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the mak-

ing of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term 'business' shall include, business, profession, occupation, and calling of every kind."

The report of the investigation of the Bureau of Mines reveals and indicates the following: The historical background, general description of the plant, description of process, construction of tanks, various connections, operation features, description as to the accident, distribution of fragments, etc., and in general all such features of the report, are merely what some investigator for the Bureau of Mines learned from talking with various persons or from analyzing certain articles and plans for construction. In this portion of the report there is nothing that the Bureau of Mines did that would be in the regular course of business, as the cases interpret that expression.

■■■ The report made reference to statements or conclusions which amount to an expression of opinion by persons who would be qualified as experts. As to the failure to call said experts to testify, counsel for the plaintiff stated that the Bureau of Mines does not permit experts to talk personally with any person, give any statements, or express any comment as to any matter which came to their attention or known in furtherance of their duties as representatives of the Bureau of Mines. I sincerely doubt that if a subpoena were issued by this Court or authority given to take a deposition of one or all of said experts, that any judicial authority exists which would exempt said persons from testifying, since the primary concern of the federal courts is to have all facts that are relevant and the truth made known, regardless of the channel from which the information might come. I cannot reach the conclusion that a cloak of protection should be thrown around an individual employed by a governmental agency so as to exempt that person from testifying solely due to the reason that said person was employed or gained information while furthering a directive of the Bureau of Mines.

■■■ The purpose of the exception of the hearsay rule, as I read the authorities, where reference is made to reports formulated by an agency of the government by virtue of a congressional authority is to make possible the presentment of facts or circumstances which appear in that report where it is necessary to rely on what is in the report in order to avoid a miscarriage of justice. The Bureau of Mines' report is formulated in such a manner that of the five experts mentioned therein, it is not set forth which expert reached the conclusion that was expressed. I believe the defendants would suffer a substantial prejudice if the opinions of the experts which are set forth in the report had been made available for the jury.

No right of cross examination would exist in favor of the defendants as to the basis for the experts reaching the conclusion which they did. As to the matters which appear in the report, it must again be remembered that reports of this nature are made an exception to the hearsay rule where it is necessary to rely thereon in order to avoid a miscarriage of justice. As to all other matters which appear in the report, evidence was offered by the plaintiff to establish said facts, and the statements in the report amounted to no more than cumulative evidence.

To be admissible said report must have been made in due course or the regular course or business of the Bureau of Mines. There were no day to day entries made in the preparation and formulation of said report, and no individual investigation was made other than the analysis of the gas and steel which the Court informed counsel could be read to the jury. Both parties argued that Palmer v. Hoffman, supra, governed the question which arises. The problem, therefore, exists as to whether or not under the facts the report is admissible. If the report was not made in the regular course of business of the Bureau of Mines or is based on hearsay, it is clearly not admissible. Palmer v. Hoffman, supra, and 144 A.L.R. 727.

■■■ Where records of a primary fact are made by a public officer in the performance of an official duty as to the ex-

istence of certain facts, said records are admissible; but records of investigations and inquiries conducted either voluntarily or pursuant to the requirements of law by public offices concerning causes or effects and involving the exercise of judgment and discretion, expressions of opinion, and making conclusions, are not admissible in evidence as public records. Commonwealth of Mass. v. Slavaki, 245 Mass. 405, 140 N. E. 465, 29 A.L.R. 281.

■ Public records compiled in the regular course of business are considered a justifiable abridgement of the privilege of cross examination on the grounds that the inquisition or inquiry was in the nature of a judicial proceeding wherein the right of cross examination was amply safeguarded and protected. But expressions of opinion and conclusions on causes and effects based upon factual findings are not always admissible as public records, especially when it is shown either that the conclusion or opinion which the statement purports to convey would not be admissible in evidence if tendered by the direct testimony of the maker, or if the denial of the right of cross examination would result in the perversion of the rule of trustworthiness and reliability. The search is for truth and the trial court is the first and best judge of whether tendered evidence meets that standard of trustworthiness and reliability which will entitle it to stand as evidence of an issuable fact, absent the test of cross examination. Franklin v. Skelly Oil Co., 10 Cir., 141 F.2d 568, 153 A.L.R. 156; New York Life Ins. Co. v. Taylor, 79 U.S.App. D.C. 66, 147 F.2d 297.

It is my belief that the Bureau of Mines' report expresses merely the opinion of those who made the investigation and does not rise to the dignity of an adjudicator of causes and effects. This conclusion is supported by the fact that no public hearings of any nature whatsoever were held, and the matters referred to therein are based solely on information secured by the representatives of the Bureau of Mines in talking to various persons or copied from records of hearings held in one source or the other, and reduced to writing, and the opinions and judgments of other people.

If hearings had been held by the Bureau of Mines and testimony taken, conversely the report would have been admissible. As to the conclusions reached by the experts who are referred to in the report, it is not set forth therein which expert reached the conclusion which is expressed.

■ Many other cases have been cited by both parties which relate to one type or the other of public records, and a difference of opinion exists in many jurisdictions as to the admissibility thereof. No useful purpose would be gained in making reference to these cases, and on the basis of the authorities which I have referred to herein, and applying the facts which exist in the Bureau of Mines' report, it is my belief that the Bureau of Mines' report should not have been admitted either as substantive evidence or permitted in rebuttal for the purpose of contradiction.

Admissibility of A.S.M.E. Code as substantive evidence to establish negligence—

The plaintiff offered to prove during the defendants' case and after the cross examination of witnesses that although the A.S. M.E. Code is not made to apply in terms to the No. 4 tank, that a provision existed in the Code wherein the No. 4 tank could have been built under the Code with code inspection and code certification if the builders had so desired. It was the contention of the plaintiff that the A.S.M.E. Code could have been made to apply to unfired pressure vessels less than fifteen pounds per square inch. Jackson had stated in his examination that the A.S.M.E. Code does not apply and cannot be made to apply to the No. 4 tank.

The plaintiff offered said testimony as substantive evidence and if this offer was refused, requested that the Code be admitted to contradict witnesses called by the defendants. As to the substantive evidence feature, the defendants contended that in the second amended complaint there is no allegation of negligence in which it is set forth that the failure to comply with the A.S.M.E. Code was an act of negligence which contributed to or brought about the accident, and that the No. 4 tank was constructed on the basis of a

contract of the defendant corporation with Gas Machinery, and no provision existed in the contract which provided that the No. 4 tank should be constructed on the basis of the A.S.M.E. Code.

The A.S.M.E. Code provision was not offered by the plaintiff in its case in chief. The plaintiff contended that the Code was admissible for substantive purposes since a standard is set up therein which could be used in deciding whether or not the defendants exercised ordinary and reasonable care in the construction of the No. 4 tank, and since the Code was not made to apply, the jury could draw an inference that the defendants were guilty of negligence or that care was not exercised commensurate with the risk involved.

The plaintiff in its second amended complaint sets forth many allegations of negligence and states that as a direct and proximate result of the negligence of the defendants as it is set forth, the No. 4 tank failed or the catastrophe occurred. At no place in the pleadings is it set forth that failure to comply with the A.S.M.E. Code constituted an act of negligence. After the defendant objected to the admission of the Code as substantive evidence for the reason just given, the plaintiff modified its offer by stating that the A.S.M.E. Code should be admitted since the Nuisance Doctrine was set forth in the pleading. Counsel representing both the plaintiff and the defendants were in absolute disagreement as to whether or not the Circuit Court had disposed of the Nuisance Doctrine generally at the time this proceeding was previously heard by the Circuit Court. The plaintiff contended that the Circuit Court only disposed of the absolute Nuisance Doctrine but that no consideration was given the Doctrine of Qualified Nuisance which is based on negligence. That since the Qualified Nuisance Doctrine is based on negligence, the offer should be admitted although the plaintiff had specified the acts of negligence in its pleading.

■ This Court is of the opinion that the Circuit Court ruled out both the doctrines of absolute and qualified nuisance. This conclusion seems to be justified by the fact that the defendants were not in control of the property at the time of the catastrophe. The nuisance doctrines, from the research which I have made, are only held to have application in situations where the nuisance, whether it be absolute or qualified, is in control of the party who it is desired to hold responsible at the time the cause of action arose. The admission of the A.S.M.E. Code as substantive evidence of negligence was refused for three reasons:

(1) No allegation was set forth in the complaint in which it was alleged that the failure to comply with the A.S.M.E. Code was an act of negligence, and the plaintiff itemized the acts of negligence rather than making reference to negligence in general expression.

(2) That since the Doctrine of Nuisance, absolute or qualified, was held by the Circuit Court to not have application to the facts in this case, the offer as substantive evidence was not admissible under said Doctrine.

(3) That the failure of the plaintiff to offer said proof in its case in chief barred the right of the plaintiff to offer substantive proof in the cross examination of the defendants' witness, especially so when the offer was made during the last few days of trial and the proceeding had been in litigation for approximately eight to nine weeks at the time the offer was made.

■ The federal cases seem to be in agreement that where a general charge of negligence is followed by specific charges, the specific charges supersede the general, and the plaintiff must, therefore, rely upon the specific acts of negligence and not upon the general allegation of negligence. Sinclair Refining Co. v. Stevens, 8 Cir., 123 F.2d 186, certiorari denied 315 U.S. 804, 62 S.Ct. 632, 86 L.Ed. 1203; Bixby v. Chriscraft Corp., D.C., 7 F.R.D. 80; Blair v. Durham, 6 Cir., 134 F.2d 792; O'Brien v. M. & P. Theatre Corp., 72 R.I. 289, 50 A.2d 781, 171 A.L.R. 1081; Zumwalt v. Gardner, supra.

The Court informed the plaintiff that under Rule 15(a), (b) and (c) of the

Federal Rules of Civil Procedure leave would be granted the plaintiff to amend its pleading by setting forth the failure of the defendants to comply with the provisions of the A.S.M.E. Code which would constitute an act of negligence.

The Court further stated to plaintiff's counsel that if the offer had been made during the presentment of its case, leave would have been granted to amend the pleading and the proof admitted. However, since the offer was not made until near the end of the defendants' case, and an objection was made, I believed the defendants would have been severely prejudiced to have admitted the offer. The matters referred to in the A.S.M.E. Code related to most complicated and involved technical engineering data. Since an inference of negligence could have been drawn from failure to comply with the A.S.M.E. Code, I did not believe sufficient time or opportunity existed for the defendants to prepare to meet or rebut the inference which might be drawn by the jury.

As a result, the plaintiff was informed that leave to amend would be granted, but only on condition that the case be continued. The plaintiff elected not to amend since a continuance was not desired.

The situation which existed was one in which plaintiff's counsel alone could have controlled and corrected in the following ways:

(a) In making the offer at the proper time during the presentment of plaintiff's case.

(b) In asking leave to amend the pleadings before trial or during the plaintiff's case.

In fact, the offer of the A.S.M.E. Code by the plaintiff was made approximately an hour before the defendants rested their case.

■ The Court, however, permitted examination to be made of defendants' witnesses relative to the application of the A.S.M.E. Code for the purpose of impeachment of other witnesses called by the defendants. Since the witnesses examined stated that the Code could be made to apply, the introduction of the Code was not proper for the purpose of contradiction.

■ I, therefore, believe to have admitted the Code as substantive evidence of negligence, in view of the pleadings, would have caused prejudicial error to the defendants.

## IV. Error in Admission of Evidence Offered by Defendant.

The defendants offered evidence relative to certain changes which were made in and about the No. 4 tank by the East Ohio Gas Company subsequent to the completion of the construction and turning over of the tank to said company. It went into great detail as to the changes which were made and developed that the hazards in the operation of the plant were increased as a result thereby.

This was allowed in order to show that when the tank gave way or the disaster occurred, it was not the same tank that the defendants had constructed, and the defendants contended that they were not responsible for hazards and conditions over which they had no control or responsibility. The Court instructed the jury that if a change in conditions were found to be a proximate or a contributing factor to the accident, that did not relieve the defendants from responsibility if the jury finds that the defendants were also negligent in a way or in a manner which contributed to or brought about the accident. However, if the changes made by the East Ohio Gas Company brought about the accident and there was no negligence that existed on the part of the defendants in any manner which was a proximate or contributing cause of the accident, then the defendants would not be responsible. On another occasion in the charge the Court instructed the jury that any change or changes would not avail to the defendants to prevent a recovery against them if the jury finds that the defendants were negligent in the original design, construction and fabrication of the No. 4 cylindrical tank, and that such negligence was a proximate cause of the disaster, or directly or substantially contributed to it.

.The defendants were permitted to read from the allegations in the second amended complaint, which were in contradiction of testimony offered by the plaintiff, to establish that the catastrophe was caused in the manner contended by the defendants. This was proper. Stolte et al. v. Larkin, 8 Cir., 110 F.2d 226.

I do not believe that any error existed, therefore, in permitting the defendants to establish and prove the various changes which were made in and about the tank subsequent to the time that it was constructed and turned over to the East Ohio Gas Company for operation.

### V. Error in the Instructions to the Jury.

The Court's charge on negligence included the defendants' responsibilities and plaintiff's burden of proof.

The plaintiff has taken excerpts from the contents of the Court's charge and claims that the charge on negligence creates confusion and misunderstanding. However, if the charge is considered as a whole, it is self-evident that the first part of the charge on negligence related to the direct testimony which was presented by the plaintiff to establish that negligence existed in the design, fabrication or construction of said tank. Testimony was offered by the plaintiff that the inner tank was improperly designed, fabricated and constructed. After the completion of the Court's charge on the direct testimony, the Court outlined in its charge that the plaintiff was not bound to establish negligence by direct testimony, but could establish negligence and support a right to recover on the basis of circumstantial evidence from which inferences of negligence could be drawn. The Court then gave a detailed explanation of circumstantial evidence, and the measure of proof required under the law in order to support a right to recover on the basis of circumstantial evidence. If the complete record is read, it is self-evident that the charge of the Court related to the two different theories upon which the plaintiff could premise the right to recover.

Where circumstantial evidence is relied upon to establish that the defendants' breach of duty was the legal cause of the harm suffered, the law requires only that the evidence as to the operative cause of the accident be enough to satisfy reasonable and well-balanced minds that it was the one on which the plaintiff relied. Straight, Admrx., Appellant v. B. F. Goodrich Co., 354 Pa. 391, 47 A.2d 605.

The facts of an accident may be proved by circumstantial evidence and negligence may then be inferred from the facts so found. The plaintiff is not required in proving negligence and its casual connection with an accident where reliance is placed on substantial evidence to eliminate all possible causes other than that on which he relied, but only such other causes, if any, which fairly arise from the evidence. Giordano, Appellant, v. Clement Martin, Inc., et al., 347 Pa. 61, 31 A.2d 504; Fidelity-Philadelphia Trust Co. v. Staats, et al., 358 Pa. 344, 57 A.2d 830; Stanalonis, Admr., v. Branch Motor Express Co., 358 Pa. 426, 57 A.2d 866; Sharble et al. v. Kuehnle-Wilson, Inc., 359 Pa. 494, 59 A.2d 58.

The jury was also instructed that they were not bound to accept the testimony of any witness; that it was their prerogative to pass upon their credibility and to determine where the truth might arise, and at no time was the jury instructed that they were obliged to accept the testimony of any witness, the matter being left solely for their determination.

Where there is contradictory evidence on material facts, the issue of credibility is for the jury, and this is so although a party is contradicted in some respects by his own witnesses. O'Farrall v. Nawson et al., 320 Pa. 316, 182 A. 538.

If contradictory evidence comes from the plaintiff's witnesses, the rule applies that if in one part of the plaintiff's testimony, or that of the witness, it is entitled to go to the jury, and another part not, or where different parts of testimony are inconsistent, it is for the jury to reconcile such conflicting statements

284

and say which shall prevail. Giles, Appellant, v. Bennett et al., 298 Pa. 158, 148 A. 90.

The instructions to the jury were fair and impartial. When considered as a whole, I believe it will be found consistent and in accordance with the provisions of law which govern an action based on negligence.

In a proceeding which is so involved, I doubt if it would be humanly possible to administer the trial without technical error arising, both as to the plaintiff and the defendants.

It is my judgment that no substantial error exists and the disposition of the motion for new trial calls for the application of the rule that "Mere technical errors which do not affect the substantial rights of the parties are not sufficient to set aside an adverse jury verdict." He who seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted. Palmer et al. v. Hoffman, supra.

That burden has not been established in this case. The motion for new trial is refused.